<u>NOT FOR PUBLICATION</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, | Crim. Action No. 13-00626 (JLL) |
| v. | OPINION |
| MICHAEL GRAHAM, | |
| Defendant | |

**LINARES,** District Judge.

This matter comes before the Court by way of Defendant Michael Graham ("Defendant")'s motion to suppress evidence seized from his person on the night of June 19, 2013. The Court has considered the arguments made and the testimony offered on the record on May 14, 2014. For the reasons set forth below, Defendant's motion to suppress evidence is **DENIED**.

**I. BACKGROUND**

The facts giving rise to the present motion to suppress evidence are as follows. On the night of June 19, 2013, Detective Abraham James, Sergeant Juliano and Officer Vinueza of the Newark Police Department were on proactive patrol[1] in the West Ward of Newark. (*See* Tr. 8:4-15). The West Ward is part of the Fourth Precinct and encompasses 16th Avenue from South 10th to South 14th Street. (*Id.* at 8:4-9). It is undisputed that the driver of the car, Kenneth Wesley ("Wesley"), was issued the following traffic citations: (1) maintenance of lamps (*id.* at 37:7-15, 117:5-7; Govt.'s Ex. 56); (2) failure to wear a seatbelt (Tr. 38:20-39:1, 117:2-4; Govt.'s Ex. 57);

---

[1] Detective James testified that proactive patrol means that the officers patrol the area for carjacked vehicles due to a recent increase in carjackings. (Tr. at 10:20-11:2).

1

and (3) obstructed view (Tr. 39:21-40:2, 116:24-117:1; Govt.'s Ex. 58). Both Detective James and Wesley testified at the suppression hearing held on May 14, 2014. (*See generally*, Tr.). Detective James was the sole witness for the Government and Wesley was the sole witness for the Defense. The witnesses offered competing accounts of what transpired leading up to the seizure of the firearm from Defendant, and their testimony is reviewed below.

A. <u>Testimony of Detective James</u>

At the suppression hearing, Detective James testified he has been a police officer with the City of Newark for thirteen years and for the past seven years he has been a detective. (Tr. 6:17-22). Throughout his career he has made about twenty or more firearm arrests. (*Id.* at 7:19-21). At the suppression hearing, Detective James explained that at the direction of Sergeant Juliano, the officers were patrolling the area for carjacked vehicles on the night of June 19, 2013 resulting from an increase in carjackings. (*Id.* at 10:20-11:2; 51:19-22). During proactive patrol the officers were also looking for other traffic infractions. (*Id.* at 11:3-7). Detective James further explained that he and Officer Vinueza were in one unmarked police vehicle and Sergeant Juliano was in another unmarked police vehicle. (*Id.* at 8:17-25). While on proactive patrol the three officers were traveling west on 16th Avenue and observed a green BMW ("the BMW" or "the vehicle") traveling eastbound with its front headlights out at a high rate of speed. (*Id.* at 11:13-12:4; 46:22-24). According to Detective James, the officers then made a U-turn and activated their emergency lights. (*Id.* at 12:15-21). Upon pulling the BMW over, Detective James and Officer Vinueza pulled their vehicle in front of the BMW at an angle while Sergeant Juliano pulled his vehicle behind the BMW. (*Id.* at 13:11-12; Govt.'s Ex. 1).

After all three vehicles came to a stop, Sergeant Juliano advised the others via radio that the backseat passenger was moving around. (Tr. 15:23-25). Detective James testified that when

he heard this alert over the radio, he was "concerned." (*Id.* at 67:7-9). Detective James and Officer Vinueza then exited their vehicle and began to approach the BMW, at which time they could tell that there were four male occupants in the vehicle. (*Id.* at 16:3-8, 15-19). While approaching the BMW, Detective James also observed Defendant moving around and thought "he was adjusting his clothes or might have been concealing something." (*Id.* at 68:1-5). Detective James testified that throughout this incident Defendant was clothed in a black zip-up hoodie, a pink shirt and camouflage shorts. (*Id.* at 25:13-16; 34:3-4; Govt.'s Ex. 7; Govt.'s Ex. 8). He also testified that Defendant's hoodie remained zipped up during this encounter. (Tr. 66: 1-2).

Upon receiving the radio alert from Sergeant Juliano, Detective James approached the passenger side of the vehicle with his flashlight and "illuminated the inside of the vehicle." (*Id.* at 17:6-7). At that time, Detective James observed Defendant's movements and directed Defendant to stop moving and raise his hands. (*Id.* at 17:9-16). Detective James testified that the back seat of the BMW could potentially be a small area, depending on the size of the backseat passenger. (*Id.* at 64:19-21; Govt.'s Ex. 4). Additionally, Defendant was characterized as being about two hundred pounds and not a slim man. (Tr. 65:4-8). Nonetheless, upon shining his flashlight into the back seat of the BMW, Detective James testified that he was able to observe the black handle of a firearm protruding from the Defendant's left waist area. (*Id.* at 17:21-22). Detective James then "gave Vinueza eye contact and a nudge of [his] head." (*Id.* at 78:12). According to Detective James he did not say "gun" because Defendant was complying and "to avoid any situations, I pretended like I didn't see anything, but I alerted my partner so he would know." (*Id.* at 78:25-79:2). At this point, Officer Vinueza and Sergeant Juliano removed the other three passengers from the vehicle. (*Id.* at 17:25-18:7; 82:4-25; *see also* Def.'s Ex. 4).

Upon being removed from the BMW the other three passengers were patted down. (Tr. 91:4-5). Thereafter, Detective James leaned into the BMW while his feet "stay[ed] out on the pavement" (*Id.* at 19:18-19), and had Defendant turn his back to him. (*Id.* at 18:9-11). Detective James testified that Defendant was compliant throughout this maneuvering in the back seat of the vehicle. (*Id.* at 85:11, 22-23). According to Detective James, he then handcuffed Defendant and "removed the firearm from [Defendant's] waist and placed it in my waist, and I removed [Defendant] from the car, and I frisked him again for any more contraband, which proved negative at that time." (*Id.* at 19:8-20:1; 85:1-3; 100:15-17).

Detective James additionally testified that none of the officers had their guns drawn at any time during the incident. (*Id.* at 18:24-25; 60:6-8; 66:16-17). The officers did not draw their guns because there was no threat. (*Id.* at 19:1-2). Detective James was questioned about the situation and provided the following explanation,

> Q: Why didn't you think there was a threat?
>
> A: Because I don't know whether Mr. Graham observed that I saw the firearm in his waist or not, so he wasn't moving. He listened to my commands, so therefore, there was no need for me to pull my weapon out.

(*Id.* at 19:3-7).

### B. Testimony of Kenneth Wesley

The testimony of the driver of the BMW, Kenneth Wesley ("Wesley"), offers a different account of the events leading up to the discovery of the firearm and the ultimate arrest of Defendant. (*See generally,* Tr.). Wesley testified that on the night of June 19, 2013, at around 11:30 p.m., he was driving the BMW on 16th Avenue on his way back from Popeye's, a fast food restaurant. (*Id.* at 107:24-108:10). According to Wesley, he was wearing a seat belt, he was not speeding, and his headlights were on and working. (*Id.* at 109:16-17; 110:12-19). Defendant

4

and another passenger were sitting in the back seat. (*Id.* at 110:1-4). Specifically, Defendant was sitting on the rear passenger side. (*Id.* at 110:3-8). Wesley testified that upon pulling over the vehicle, the officers got out of their car with their guns drawn. (*Id.* at 114:15-19). The officers proceeded to remove the passengers with the exception of Defendant, who remained in the backseat. (*Id.* at 115:9-11). After the other passengers were removed from the BMW, an officer approached Defendant and patted him down while he was still in the back seat, at which time the gun was discovered. (*Id.* at 115). Wesley testified that he was never asked for his license or registration throughout the incident. (*Id.* at 119:1-3). Wesley testified that he has previously "had problems with [his] headlights" and receives tickets all the time.[2] (*Id.* at 126:24-127:1, 132:17-19).

The Court highlights the fact that Wesley filled out an affidavit on February 28, 2014, before a notary. (*Id.* at 122). Of critical importance to Wesley's credibility is the fact that, the affidavit provided at paragraph nine that "[a]t no time did any officer have a gun drawn." (*Id.* at 123:19-20; Govt.'s Ex. 61). During his testimony, Wesley did not deny that this statement was contained in his affidavit. (Tr. 123:21-22). The statement in Wesley's affidavit is in direct conflict with the testimony he offered before this Court where he clearly stated that the officers came out of their cars with guns drawn. (*Id.* at 114:15-19; 123:19-20; Govt.'s Ex. 61). When asked about the discrepancy between his affidavit and testimony Wesley's explanation was that "I really couldn't recall at that time." (Tr. 144:24-25).

---

[2] It bears mentioning that during the suppression hearing before this Court the Government sought to introduce evidence of Wesley's prior traffic infractions pursuant to Federal Rule of Evidence 404(b)(2). (*See* Tr. 136-141). However, such evidence is improper under the rule to prove action in conformity therewith, and for that reason the Court ruled it inadmissible and thus does not consider the witness's prior offenses in writing this Opinion. (*See* Tr. 140; 141: 19-21); *see also* Fed. R. Evid. 404(b) ("[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character").

### C. Procedural History

On September 24, 2013, a federal grand jury sitting in Newark returned a one-count indictment against Defendant for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). (*See* CM/ECF No. 1). On March 6, 2014, Defendant filed a motion to suppress evidence of the firearm. (CM/ECF No. 15). The Court convened a hearing to address Defendant's motion on May 14, 2014, at which time it heard testimony from Detective James and Wesley, as well as oral argument from both parties. (CM/ECF No. 23). The Court reserved decision on Defendant's motion at that time. (*Id.*).

## II. LEGAL STANDARD

The Fourth Amendment to the U.S. Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. To prevail on a motion to suppress, a defendant generally bears the burden of proving that the challenged search or seizure was unreasonable under the Fourth Amendment. *See United States v. Acosta*, 965 F.2d 1248, 1257 n.9 (3d Cir. 1992) ("The proponent of a motion to suppress has the burden of establishing that his Fourth Amendment rights were violated."). However, when a search is conducted without a warrant, as is the case here, the burden shifts to the Government to demonstrate by a preponderance of the evidence that the warrantless search did not run afoul of the Fourth Amendment. *See, e.g., United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995).

## III. DISCUSSION

In deciding whether the traffic stop of the BMW and the subsequent search of Defendant and seizure of the firearm violated Defendant's Fourth Amendment rights, the Court must consider the following: (1) the credibility of the witnesses' testimony; (2) whether the initial

traffic stop of the vehicle was lawful; (3) whether the officers possessed a reasonable and articulable suspicion so as to justify expanding the scope of the traffic stop; and (4) whether the officers' seizure of the firearm from Defendant was proper. *See Terry v. Ohio,* 392 U.S. 1, 26 (1968) ("A search for weapons in the absence of probable cause to arrest, however, must, like any other search, be strictly circumscribed by the exigencies which justify its initiation. Thus, it must be limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby, and may realistically be characterized as something less than a full search, even though it remains a serious intrusion.") (internal citations and quotations omitted).

### A. Credibility Determination

In light of the conflicting testimonies offered by the two witnesses, the Court must assess the credibility of each witness's testimony. As a preliminary matter, on a motion to suppress evidence, it is the trial court that determines the credibility of witnesses. *Government of the Virgin Islands v. Gereau,* 502 F.2d 914, 921 (3d Cir. 1974) (holding that "credibility determinations are uniquely the province of the fact-finder"); *see also United States v. Demings,* 787 F. Supp. 2d 320, 326 (D.N.J. 2011) (holding that "the trial court determines the credibility of witnesses") (citing *United States v. Davis,* 514 F.2d 1085, 1088 (7th Cir. 1975)). As such, the court can "accept or reject any or all of a witness's testimony." *Demings,* 787 F. Supp. 2d at 326 (citing *United States v. Murphy,* 402 F. Supp. 2d 561, 569-570 (W.D. Pa. 2005)); *see also United States v. Harris,* 507 F.2d 197, 198 (3d Cir. 1975) (holding that a judge sitting as a fact finder "is at liberty to make findings of credibility"). In particular, credibility determinations "are to be made in consideration of numerous factors, including the witness's demeanor and manner while on the stand, the witness's ability to accurately recollect the matters at hand ... and, ultimately,

the extent to which [the testimony] withstands a common sense test of reason and logic." *Murphy*, 402 F. Supp. 2d at 569; *see also Demings*, 787 F. Supp. 2d at 326 (citing *Murphy*, 402 F. Supp. 2d at 569). Furthermore, a witness should not be considered any more or less credible because the witness is a law enforcement officer. *See United States. v. Bethancourt*, 65 F.3d 1074, 1080 (3d Cir. 1995) ("[T]he testimony of a witness is not more or less believable because the witness is [a police officer].").

In this matter both Detective James and Wesley testified at the suppression hearing. (*See generally*, Tr.). The Court had the opportunity to observe the witnesses' demeanor as well as their testimonies on direct and cross examination. (*See generally, id.*). At the hearing, Detective James repeatedly testified about the surrounding circumstances of the traffic stop. (*Id.*). Namely, that the BMW was traveling without headlights (*id.* at 11:13-25; 46:22), speeding immediately prior to the stop (*id.* at 12:1-4;50:3-5), and also that subsequent to the stop Sergeant Juliano alerted Detective James via radio that the rear seat passenger was moving around. (*See id.* at 15:24-25; 16:23-25; 60:17-24). Given the consistency of Detective James's testimony and the Court having had the opportunity to observe the detective's demeanor with regard to that part of his testimony, the Court finds that part of Detective James's testimony credible both as to the traffic stop and the Defendant's movements. However, for the reasons discussed below, the Court does not find credible Detective James's testimony surrounding the visibility of the firearm.

As it pertains to the discovery of the firearm, Detective James testified that he viewed what he believed to be the handle of a firearm on Defendant's left waist area. (*See id.* at 17:20-22). However, the Court does not find it credible in light of the undisputed size of the Defendant, (Tr. 65:4-8), the narrow confines of the back seat, (*id.* at 64-19-21; Govt.'s Ex. 4), the

hoodie the Defendant was wearing (a picture of which was seen by the Court), (Tr. 65:21-25), and the relative location of the detective and the Defendant (Defendant was on the passenger side of the back seat while Detective James was outside the vehicle to Defendant's right and the gun was allegedly on Defendant's left waistband), (*id.* at 77:17-25), that Detective James was, in fact able to see the handle of the firearm. For all of these reasons, the Court finds that this portion of Detective James's testimony does not withstand "a common sense test of reason and logic" *Demings,* 787 F. Supp. 2d at 326, and therefore does not credit Detective James's testimony that he viewed the firearm when Defendant was asked to raise his hands.

As to the driver's testimony, the Court finds that Wesley's testimony is only credible in part for the reasons stated herein. As previously stated, Wesley submitted a sworn affidavit to the Court on February 28, 2014, in which he stated that the officers never had their guns drawn. (*See* Tr. 122-123; *see also* Govt.'s Ex. 61). However, his live sworn testimony before this Court on May 14, 2014 provided that the officers emerged from their car with their guns drawn. (*See* Tr. 114:9-16; 123:9-17). These two accounts are diametrically opposed to one another. (*See id.* at 114:9-16; 123:9-22; *see also* Govt.'s Ex. 61). In light of the extreme inconsistency between the affidavit and the live sworn testimony and Wesley's inability to explain the same, the Court finds that neither Wesley's testimony nor his sworn affidavit may be credited as to whether the officers had their guns drawn. *See Gereau,* 502 F.2d at 921 (holding that "credibility determinations are uniquely the province of the fact-finder"). Nonetheless, for the reasons discussed below, the Court credits Wesley's testimony as to the pat down of Defendant.

With regard to the pat down of Defendant, Wesley testified that once the officers got out of their car they directed Wesley to step out of the BMW. (*Id.* at 114:20-21). The officers then removed the other passengers from the vehicle with the exception of Defendant, who was sitting

in the rear passenger seat. (*Id.* at 114:24-115:11). Wesley testified that once the other three passengers were outside of the vehicle, Defendant was patted down while he was still inside the vehicle and the gun was discovered at this time. (*Id.* at 114:24-115:13). In light of the fact that a gun was ultimately discovered and seized from Defendant's person, the Court finds it credible that the gun was discovered following a pat down of the Defendant as testified to by Wesley. *See Harris,* 507 F.2d at 198 (holding that a judge sitting as a fact finder "is at liberty to make findings of credibility").

    B.    The Traffic Stop

Having made the aforementioned determinations as to credibility, the Court now considers whether the traffic stop was proper. Traffic stops based on an officer's "reasonable, articulable suspicion that criminal activity is afoot" do not run afoul of the Fourth Amendment. *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry*, 392 U.S. at 30). "[A] traffic stop will be deemed a reasonable 'seizure' when an objective review of the facts shows that an officer possessed specific, articulable facts that an individual was violating a traffic law at the time of the stop." *United States v. Delfin-Colina*, 464 F.3d 392, 398 (3d Cir. 2006). A "[r]easonable, articulable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Id.* at 396 (citing *Wardlow*, 528 U.S. at 123). "Courts give considerable deference to police officers' determinations of reasonable suspicion, and the cases are steadily increasing the constitutional latitude of police to pull over vehicles." *United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006) (citing cases). In deciding whether a traffic stop was based on a reasonable suspicion, courts "must consider the totality of the circumstances – the whole picture." *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002) (quotation marks and citation omitted). Based on its review of the credible testimony

offered by Detective James, with regard to the circumstances and reasons for the traffic stop, the Court determines that the traffic stop was in fact based on a reasonable and articulable suspicion that the BMW was in violation of the traffic laws at the time the stop was made. *See Delfin-Colina*, 464 F.3d at 397 (holding that an officer must possess "specific, articulable facts to justify a reasonable suspicion to believe that an individual has violated the traffic laws").

Detective James credibly testified that he viewed the BMW traveling in the opposite direction without headlights. (Tr. 11:13-12:4; 46:22-24). Both police vehicles then turned around and proceeded to pull over the BMW. (*Id.* at 12:15-21). Detective James has been a police officer with the City of Newark for thirteen years and a detective for approximately seven of those years. (*Id.* at 6:17-22). The Government has submitted a photograph of the BMW from the night of the traffic stop. (*See* Govt.'s Ex. 2). Upon reviewing the Government's photograph of the BMW, the Court finds that the photograph corroborates Detective James's testimony that on the night in question, the BMW's headlights were not on. (*See id.*). In particular, the orange lights surrounding the headlights were illuminated while the actual headlights were not, and therefore, it is apparent to the Court that the main headlights were not illuminated on the night of June 19, 2013 as testified to by Detective James. (*See id.*).

Detective James's observation of the car without headlights therefore constituted a reasonable and articulable suspicion that Wesley was in violation of N.J.S.A. 39:3-47(a).[3] *See*

---

[3] N.J.S.A. 39:3-47(a) provides that:

> No person shall drive, move, park or be in custody of any vehicle or combination of vehicles on any street or highway during the times when lighted lamps are required unless such vehicle or combination of vehicles displays lighted lamps and illuminated devices as hereinafter in this article required.

Additionally, N.J.S.A. 39:3-46 defines "When lighted lamps are required" as, "any time from a half-hour after sunset to a half-hour before sunrise…" *See* N.J.S.A. 39:3-46; *see also Brown v. City of Camden*, 03-1303 JBS, 2006 WL 2177320 at *2 n.4 (D.N.J. July 27, 2006).

11

*United States v. Johnson,* 434 F. App'x 159, 162 (3d Cir. 2011) (holding that "[t]he Supreme Court [has] established a bright-line rule that any technical violation of a traffic code legitimizes a stop, even if the stop is merely pretext for an investigation of some other crime") (citing *United States v. Petersen,* 622 F.3d 196, 201 (3d Cir. 2010)). In light of the deference given to police officers in determining the existence of reasonable suspicion for a traffic stop, this Court finds that the officers' observations provided a reasonable and articulable suspicion that the BMW did not have its headlights on at the time of the initial traffic stop. Based on the totality of the circumstances, the Court therefore concludes that the traffic stop of the BMW was proper and as such did not violate the Fourth Amendment.

    C.    <u>The Investigatory Stop and the Seizure of the Firearm</u>

Having determined that the stop of the vehicle was constitutionally proper, the Court now must determine whether the officers (1) had the authority to expand the scope of the traffic stop for further investigation and (2) had the authority to engage in a protective search which led to the ultimate seizure of the firearm from Defendant's person.

    1.    <u>Whether the Officers had the Authority to Expand the Scope of the Traffic Stop</u>

It is well established that "[o]nce a valid traffic stop is initiated, an officer who develops a reasonable, articulable suspicion of criminal activity may expand the scope for further investigation." *United States v. Lewis,* 672 F.3d 232, 237 (3d Cir. 2012) (citing *United States v. Givan,* 320 F.3d 452, 458 (3d Cir. 2003)). "While reasonable suspicion must be more than an inchoate hunch, the Fourth Amendment only requires that police articulate some minimal, objective justification for an investigatory stop." *Givan,* 320 F.3d at 458 (citing *United States v. Sokolow,* 490 U.S. 1, 13 (1989)) (internal quotations omitted). Furthermore, in assessing whether there was a basis for reasonable suspicion, "a court must consider the totality of the

12

circumstances, in light of the officer's experience." *Givan,* 320 F.3d at 458. The reasonable suspicion standard affords "great deference to the officer's knowledge of the nature and nuances of the type of criminal activity that he had observed in his experience, almost to the point of permitting it to be the focal point of the analysis." *Id.* (citing *United States v. Nelson,* 284 F.3d 472, 484 (3d Cir. 2002)).

Here, the Court credits Detective James's testimony supporting his basis for expanding the scope of the traffic stop. Detective James has made about twenty firearm arrests in his career, and thus has experience in detecting firearms. (Tr. 7:19-21). In particular, Detective James testified that he was alerted by Sergeant Juliano that there was movement in the rear of the BMW and that he became concerned. (*Id.* at 68:4-7). Detective James additionally testified that he observed Defendant's movements as he approached the BMW and thought Defendant was adjusting his clothes or might have been concealing something. (*See id.* at 67:7-9; 68:4-7; 73:3-5). Detective James subsequently directed Defendant to stop moving and to raise his hands. (*Id.* at 73:6-25). Since Detective James had a reasonable suspicion of criminal activity based on the alert he received from Sergeant Juliano coupled with his own observations of the Defendant's movements, he was permitted to expand the scope of the initial traffic stop and order Defendant to raise his hands. *See Givan,* 320 F.3d at 458 ("[A]n officer who develops a reasonable, articulable suspicion of criminal activity may expand the scope ... beyond the reason for the stop."); *see also United States v. Bonner,* 363 F.3d 213, 216 (3d Cir. 2004) (holding that an officer "may order all of the occupants to remain in the car with their hands up"). Accordingly, the Court finds that the officers did not violate Defendant's Fourth Amendment rights by expanding the scope of the traffic stop by approaching the Defendant and asking him to put his hands up. (*See* Tr. 73:6-8).

2. <u>Whether the Officers Were Justified in Engaging in a Protective Search and Seizing the Firearm</u>

The Court must additionally address whether Detective James's seizure of the firearm from Defendant's person was justified under the circumstances. The Supreme Court has "repeatedly recognized that traffic stops are dangerous encounters that result in assaults and murders of police officers." *United States v. Moorefield*, 111 F.3d 10, 13 (3d Cir. 1997) (citing cases). Additionally, the Supreme Court has held that the "risk of danger to a police officer conducting a traffic stop is likely to be greater when there are passengers in addition to the driver in the stopped vehicle." *Id.* at 13 (citing *Maryland v. Wilson*, 519 U.S. 408, 413 (1997)).

In *Terry*, 392 U.S. at 29, the Supreme Court explained that in conducting a protective search, "[t]he sole justification of the search ... is the protection of the police officer and others nearby, and it must therefore be confined in scope to an intrusion reasonably designed to discovery of guns, knives, clubs, or other hidden instruments for the assault of the police officer." Furthermore, "a police officer conducting an investigative stop has an immediate interest ... in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him." *United States v. Johnson*, 592 F.3d 442, 452 (3d Cir. 2010) (internal citations and quotations omitted). As such, when an officer "has a reasonable basis for believing that the individual ... is armed and presently dangerous, he may take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." *Id.* (internal citations and quotations omitted). Thus, a pat-down for weapons "can occur only where the officer is able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." *Moorefield*, 111 F.3d at 13 (citing *Terry*, 392 U.S. at 21) (internal quotations omitted).

14

Here, Detective James testified that he saw what he believed to be the handle of a gun in Defendant's left waist area. (Tr. 17:20-22). The Court has considered the following facts offered by this witness and the Government at the suppression hearing and rejects this portion of Detective James's testimony for the following reasons. *See Demings,* 787 F. Supp. 2d at 326 (holding that a court may "accept or reject any or all of a witness's testimony"). First, the Government submitted a photograph depicting the back seat of the BMW which Detective James himself testified could potentially be a small space depending on the size of the backseat passenger. (Tr. 64:19-23; Govt.'s Ex. 4). Second, Detective James agreed with defense counsel's description of Defendant as approximately two hundred pounds and not a slim man. (Tr. 65:4-8). Additionally, Detective James testified both on direct and cross examination that Defendant was wearing a black hoodie throughout the incident. (*Id.* at 36:17-21; 65:18-66:2). Furthermore, the black hoodie remained zipped throughout the encounter and the gun was allegedly located on the left side of Defendant's waistband, away from the side of the car on which Detective James was standing. (*Id.* at 66:1-2; 77:4-22). Based on the aforementioned evidence, the Court does not find it credible that as Defendant lifted his arms the handle of the gun became visible for Detective James to see. *See e.g., Harris,* 507 F.2d at 198 (holding that a judge sitting as a fact finder "is at liberty to make findings of credibility").

This, however, does not end the Court's analysis since it is undisputed that eventually a gun was in fact retrieved from Defendant's person. (*See generally,* Tr.). However, since the Court has already determined that Detective James did not view the firearm prior to reaching for Defendant's waistband, it follows that the seizure of the gun only becomes valid under the Supreme Court's holding in *Terry,* if Detective James had a basis to engage in a protective search of Defendant. *See Terry,* 392 U.S. at 27 (holding that an officer may conduct a protective

15

search "where [the officer] has reason to believe that he is dealing with an armed and dangerous individual"). In this instance, therefore, the issue becomes whether the gun was actually discovered pursuant to a pat down after Defendant's compliance with Detective James's directions to cease movement, (Tr. 73:19-20), raise his hands (*id*. at 73:19-22) and turn around. (*Id*. at 85:1-3, 11, 22).

As to the pat down, the relevant testimony is as follows, the passengers with the exception of Defendant were removed from the vehicle and patted down. (*Id*. at 91:4-5). Meanwhile, as testified to by Wesley, the Defendant remained in the vehicle and was then patted down at which time the firearm was discovered. (*Id*. at 114:20-115:13). Having found that a pat down did in fact occur, the Court also finds that since Detective James has already indicated to the Court that he had a reasonable and articulable suspicion of criminal activity so as to expand the scope of the traffic stop on the basis of Defendant's movements (*id*. at 67:7-9; 68:4-7; 73:3-5), the subsequent pat down of Defendant was proper under *Terry*. 392 U.S. at 30 (holding that an officer may "conduct a carefully limited search of the outer clothing of [an individual] in an attempt to discover weapons which might be used to assault him"). Thus the seizure of the gun did not violate Defendant's Fourth Amendment rights.

Accordingly, the Court **denies** Defendant's motion to suppress the firearm.

## IV.   CONCLUSION

For the foregoing reasons, Defendant's motion to suppress evidence is **denied**. An appropriate order accompanies this Opinion.

Jose L. Linares
United States District Judge

Date: July 9, 2014